# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:22-CR-20-KAC-JEM |
| | ) | |
| SHARDE R. SIMMON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant Sharde Simmon's Motion for Detention Hearing and Motion for Pretrial Release on Conditions [Doc. 149]. *See* 28 U.S.C. § 636(b). Defendant Simmon was arrested in the Eastern District of Michigan, had a detention hearing before United States Magistrate Judge Anthony P. Patti, and was detained [Doc. 96 pp. 8, 10–12]. Defendant now asks for a detention hearing and to be released on conditions, including that she live with her brother, that both her brother and mother serve as third-party custodians, and that she work in her mother's home elder-assistance service. The Government responded in opposition to Defendant's motion [Doc. 160], and Defendant filed a reply [Doc. 168]. The Court found it must treat Defendant's motion as a motion to revoke or amend her order of detention under 18 U.S.C. § 3145(b) and must prepare a report and recommendation for the District Judge as to whether Judge Patti's detention order should be revoked [Doc. 180].

After a *de novo* review, the Court finds that Defendant has proffered information to overcome the presumption of detention. The Court, however, finds that the proposed conditions

will not reasonably assure the Court of the safety of the community. Accordingly, the Court recommends that the District Judge deny Defendant's motion to revoke the detention order.

## I.    PROCEDURAL BACKGROUND

On March 16, 2022, the Grand Jury returned an Indictment [Doc. 3] charging Defendant Sharde R. Simmon and others with conspiracy to distribute 400 grams or more of fentanyl and 100 grams or more of p-fluorofentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A) [Count One]. Defendant Simmon is also charged with aiding and abetting the possession with intent to distribute 400 grams of a substance containing fentanyl [Count Three] and aiding and abetting the possession of firearms in furtherance of drug trafficking [Count Four], both alleged to have occurred on November 10, 2021. On March 24, 2022, Defendant Simmon was arrested and brought before Magistrate Judge Anthony P. Patti for an initial appearance in the Eastern District of Michigan [Doc. 96 p. 3]. Judge Patti held a detention hearing on March 25, 2022 [*id.* at 8] and determined that Defendant Simmon should be detained [*id.* at 10–12]. Judge Patti found that Defendant Simmon failed to rebut the presumption that no condition would reasonably assure her appearance or the safety of the community and also found by clear and convincing evidence that Defendant is a danger to the community [*id.*].

Defendant Simon arrived in the Eastern District of Tennessee and appeared before the undersigned for an arraignment on May 11, 2022 [Doc. 83]. Defendant was appointed counsel [Doc. 88] and executed a waiver of detention hearing at that time [Doc. 89]. On July 1, 2022, Defendant moved for a detention hearing and to be released on conditions, arguing that conditions exist that would eliminate risk of flight or danger [Doc. 149]. The Government responded in opposition, asserting that Defendant failed to allege material and previously unknown and

2

unavailable information that would permit the reopening of the detention hearing [Doc. 160]. In reply, Defendant argued that changed circumstances and information on her alleged role in the conspiracy provided in discovery warranted reopening the detention hearing [Doc. 168].

As stated above, upon review of these issues, the undersigned determined that the Court cannot "reopen" a detention hearing conducted by another magistrate judge [Doc. 180 p. 2]. *United States v. Hanson*, No. 3:22-cr-76, 2022 WL 1813585, at *3 (N.D. Ohio May 3, 2022) ("'Reopening' of a detention hearing occurs when the same judicial officer before whom the detention hearing was originally conducted revisits the issue of detention."), *adopted by*, 2022 WL 1803337 (N.D. Ohio June 2, 2022). Instead, the Court treats Defendant's motion to be a motion to revoke or amend Judge Patti's detention order, pursuant to 18 U.S.C. § 3145(b) [Doc. 180 p. 3].[1]

The parties appeared for an evidentiary hearing on Defendant's motion on August 11, 2022. Assistant United States Attorney Brent Nelson Jones represented the Government, and Attorney Ashlee Mathis represented Defendant Simmon, who was also present. The Court received the Government's collective exhibit [Exh. 1] and heard the parties' proffers, evidence, and arguments. It then took the matter under advisement.

## II. SUMMARY OF MARCH 25 DETENTION HEARING IN THE EASTERN DISTRICT OF MICHIGAN

Defendant Simmon and two of her codefendants, Samuel Harris and Donald McCrainey, appeared for a joint detention hearing before Judge Patti in the Eastern District of Michigan on

---

[1] At the August 11 evidentiary hearing, the Court provided each party an opportunity to object to proceeding in this manner. Neither party objected.

3

March 25, 2022. Assistant United States Attorney Timothy Wyse represented the Government. Attorney Daniel J. Reid represented Defendant Simmon, who was also present.[2]

The Government presented a combined proffer pertaining to all three defendants. The Government proffered each defendant's Pretrial Services Report ("PSR"), the redacted Indictment in this case, four Federal Bureau of Investigation ("FBI") reports concerning undercover drug transactions (including one involving a traffic stop and subsequent search of a home),[3] three drug certifications from the Drug Enforcement Administration ("DEA"), and a packet of photographs obtained from social media for each defendant. The Government proffered that this case involves a total of at least eighteen (18) controlled, undercover drug buys from the combined coconspirators.

The Government argued that, due to the crimes charged, the defendants are presumed to pose a risk of danger to the community and a risk of nonappearance. It asserted that this case is the product of a well-developed and lengthy investigation that includes numerous controlled buys in the Eastern District of Tennessee and a substantial amount of fentanyl, including over 587 grams

---

[2] An audio recording of the proceeding is available to the public via CM/ECF [*See* Doc. 162-1 p. 3]. The Court has listened to the audio file and summarizes it here, as "[t]he district court may rely both on the evidence and offers of proof presented at the original detention hearing before the magistrate judge, as well as additional evidence and offers of proof at its discretion." *United States v. Tolbert*, Nos. 3:09-CR-56-TAV-HBG & 3:10-CR-30-TAV-HBG, 2017 WL 6003075, at *4 (E.D. Tenn. Dec. 4, 2017) (citations omitted).

[3] The dates of the undercover drug transactions related to those reports were represented to the court to be November 23, 2021; December 20, 2021; December 29, 2021; and January 14, 2022. During the Michigan detention hearing, Government's counsel noted the discrepancy in the November FBI report between the purported date of the stop on November 23, 2021, and the search of the residence on November 10, 2021. As explained *infra* Section III, the Government offered evidence of the November 2021 traffic stop and the undercover drug transaction occurring on December 29, 2021, at the August 11, 2022 evidentiary hearing.

4

of fentanyl packaged in 204 individual baggies seized in the search of a home following a traffic stop. The Government argued the quantity of fentanyl along with the hundreds of individual baggies suggests this was a large-scale drug trafficking operation. It noted that several firearms were involved in this case as well.

According to the Government, the defendants all posed a risk of flight as evidenced by their travel from Michigan, their place of residence, to the Eastern District of Tennessee to traffic drugs. It maintained that if released, defendants would have to travel from Michigan to Tennessee, passing through both Ohio and Kentucky, to attend proceedings. It asserted that this travel would present substantial opportunities for defendants to flee, a risk that would not be properly mitigated by the use of GPS monitoring or third-party custodians. It also argued defendants have virtually no ties to the Eastern District of Tennessee, aside from the alleged drug trafficking crimes. It argued that the alleged drug trafficking enterprise, which appears to have been lucrative, potentially provided defendants with the means to flee. The Government further pointed out that each of the defendants has at least one failure to appear in their criminal record and is a known substance abuser.

As to danger, the Government stressed the inherent and significant danger that comes with drug trafficking, especially the trafficking of fentanyl and opioids. It pointed out all three defendants participated in controlled buys, even *after* a traffic stop involving Defendant Simmon and a home search, resulting in the seizure of drugs earlier in this case. The Government argued that this continued conduct shows the defendants continued to present a serious risk of danger to the community. It pointed out too that Defendant Simmon is charged with use of firearms in furtherance of drug trafficking. The Government contended that at least two guns were seized

5

from the vehicle during the traffic stop and at least six were seized as part of the home search. The firearms involved in this case include numerous handguns as well as long guns and assault rifles. The Government also explained that each of the defendant's respective social media photo packets depict each defendant in possession of weapons and drugs. It also pointed out that Defendant Simmon had outstanding warrants for driving on a suspended license, malicious destruction of property, and contempt of court. The Government stated that she committed offenses while under supervision for another offense.

Defendant Simmon argued through counsel for release on bond with conditions, including living with her mother, who would also be her third-party custodian. Defendant also agreed to participate in a mental health evaluation and to find and maintain employment. Counsel argued that Defendant Simmon was on vacation in Tennessee at the time of the November 2021 traffic stop, was "merely present" as a passenger in the vehicle, and did not live at the residence that was searched. Counsel stated that the record did not show Defendant possessed guns during the conspiracy. He asserted that the social media photographs were from 2018 and were not related to the charged conspiracy.

Counsel for Defendant Simmon asserted that Defendant was not a flight risk as evidenced by her appearance at court proceedings in Knoxville for her state charges. He stated that Defendant was released on the Tennessee state charges on a $15,000 bond, for which she paid ten percent. He argued that Defendant's prior-failure-to-appear warrants were for minor matters and were being resolved by "plea by mail." With regard to the outstanding contempt-of-court warrant, counsel pointed out that the bond was $120, which shows it to be a minor matter.

6

Counsel further argued that Defendant intended to live with her mother, who was present in court and who would serve as her third-party custodian. He stated that Defendant's sister and two brothers would also support her. Counsel maintained that the Pretrial Services Department recommended Defendant Simmon be released.

In its rebuttal, the Government argued that a third-party custodian would not sufficiently assure the defendants' appearance in Tennessee when the custodian would be in Detroit. It further noted, specifically as to Defendant Simmon, her firearm charge and her contempt-of-court warrant.

In his findings, Judge Patti reviewed the relevant factors under 18 U.S.C. § 3142(g) and considered potential conditions of release. Judge Patti found that the nature and circumstances of the charged offense weighed in favor of detention. He noted the seriousness of the drug trafficking allegations here, which included a large amount of dangerous substances, and found the presumption that Defendant Simmon should be detained applied in this case. Judge Patti noted Defendant Simmon's firearm charge and that the indictment contains forfeiture allegations for some fourteen firearms and ammunition. He found this factor weighed against release.

As to the second factor, the weight of the evidence of dangerousness and of the risk of nonappearance, Judge Patti noted Defendant Simmon's alleged direct involvement with guns and with a large quantity of drugs. He noted the photographs of Defendant with drugs and guns taken from her social media account. Judge Patti found this factor also favored detention.

With regard to Defendant Simmon's history and characteristics, Judge Patti noted that she had convictions for felony identity theft and uttering counterfeit notes, two prior probation violations, and had failed to appear for a probation violation. He emphasized her outstanding warrants and her contempt of court. While recognizing her family support, her appearance for

7

court proceedings in Tennessee, and the availability of a third-party custodian, Judge Patti found Defendant's employment history was "spotty" and that she had only held two jobs, one for one month and one for six months, despite being twenty-seven years old. Finally, he noted that Defendant was uncooperative during her interview. Judge Patti found Defendant Simmon's history and characteristics weighed in favor of detention.

Judge Patti found the final factor, the nature and seriousness of the danger to the community posed by Defendant Simmon's release to also favor detention. While Judge Patti ultimately found Defendant had rebutted the presumption as to her appearance or non-appearance and had failed to rebut the presumption with regard to her dangerousness [Doc. 96 p. 12],[4] he found by a preponderance of the evidence that no conditions would assure Defendant Simmon's appearance and by clear and convincing evidence that no conditions would assure the safety of the community.[5]

III. **SUMMARY OF THE AUGUST 11 EVIDENTIARY HEARING BEFORE THE UNDERSIGNED**

The parties appeared before the undersigned for an evidentiary hearing on August 11, 2022. The Government presented a collective exhibit [Exh. 1], which contains two FBI reports from incidents on November 10 and December 29, 2021; a report from the Knox County Sheriff's Office ("KCSO") for the November 10, 2021 incident; two DEA Chemical Analysis Reports relating to

---

[4]     At the detention hearing, Judge Patti found Defendant had rebutted the presumption entirely. In his detention order, however, he revised his ruling, finding that she had rebutted the presumption as to her appearance or non-appearance but had failed to rebut the presumption with regard to her dangerousness [Doc. 96 p. 12].

[5]     After Judge Patti announced his decision for all defendants, the Government moved to stay the release orders of Defendants McCrainey and Harris to give the Government time to appeal the release orders in the Eastern District of Tennessee. Judge Patti granted that request.

controlled substances discussed in each FBI report; two pro se letters by Defendant Simmon from March 30 and April 2, 2022; and five photographs taken from social media accounts believed to be associated with Defendants Simmon and McCrainey.

The December 16, 2021 FBI report describes the November 10, 2021[6] stop of a white Jeep Cherokee in which Defendant Simmon was a passenger. Following a drug detection dog's alert on the Jeep, law enforcement searched the vehicle and seized 210 grams of a gray powder, which field-tested positive for heroin and fentanyl and which was packaged for distribution. According to the FBI report, law enforcement also seized thirteen ounces of marijuana, two handguns, and nine cellphones from the Jeep. Defendant Simmon was arrested and charged with state offenses. The DEA Chemical Analysis Report, which the Government contends relates to the November 10, 2021 stop and search of the Jeep, states the substance seized was fentanyl.[7]

The December 30, 2021 FBI report discusses a controlled buy of heroin and fentanyl from Defendants Simmon and Donald McCrainey, occurring on December 29, 2021. The report states that an informant made several calls to obtain fifteen grams of heroin from the drug trafficking organization and was repeatedly put off, with Defendant Simmon at one point telling the informant that someone told her 100 grams had "came up missing." The informant asked to purchase fifteen grams from Simmon and McCrainey, and Simmon agreed. Simmon called the informant twenty-

---

[6] Although the report initially states the date of the stop was November 23, 2021, the bottom of the report clarifies that the investigation was on November 10, 2021. The Government also introduced the KCSO incident report from the stop of the Jeep, which confirms the date of the stop was November 10, 2021.

[7] The Court notes that nothing on the DEA Chemical Analysis Report states that the drugs tested were from the November 10 stop and search of the Jeep. At the August 11 hearing, AUSA Jones stated the report relates to the substances seized both in the November 10, 2021 search of Jeep and from the search of an apartment later that night.

9

five minutes later, asked if he still needed to make a purchase, and confirmed the amount of fifteen grams. Approximately four hours and fifteen minutes after the informant first called about purchasing heroin, Simmon and McCrainey left an apartment on Cavetton Road, to which the informant had been sent. Simmon got in the informant's car, told him to pull out with McCrainey, and gave the informant fifteen grams of a gray powder in exchange for $1050. Simmon then got out of the informant's car at the entrance to the apartment complex, entered McCrainey's car, and left the area. The DEA Chemical Analysis Report attached to the December 30 FBI report states that the substance weighted 14.4 grams and did not contain narcotics. The Government stated this purchase contained only "cut."

The five photographs submitted by the Government appear to come from Facebook accounts. Three photographs depict Simmon holding firearms. Two of these photos are dated November 7 and one is dated November 23, with no year designated. AUSA Jones argued that these photographs show Defendant Simmon with firearms both before and after her arrest on November 10, 2021, following law enforcement's stop and search of the Jeep. The remaining two photographs are of Simmon and Donald McCrainey together. AUSA Jones asserted these photographs show that Defendant Simmon was in a relationship with McCrainey.

Finally, the Government submitted two letters from Defendant Simmon. One is directed to Judge Patti and is not dated or signed, but the envelope is stamped March 30, 2022. The second letter is addressed to the undersigned and District Judge Jordan and was docketed in Defendant's Michigan case on April 2, 2022. AUSA Jones stated these letters are provided to give context on the conspiracy.

10

Attorney Mathis directed the Court to documents verifying employment, character letters, and a document from Defendant's state case arising out of the November 10, 2021 stop, which shows Simmon appeared for state court proceedings in Tennessee. Defendant also presented the testimony of her mother and brother by video conference.

Defendant's mother Tomeeka Walton testified that she owns a business that provides light cleaning, meal preparation, and help with laundry for the elderly. Ms. Walton stated that if released, Defendant could work in her business. She said Defendant would not distribute medication, which was handled by a nurse. Ms. Walton agreed to serve as Defendant's third-party custodian and said she would supervise Defendant while working. She was aware of Defendant's charges and agreed to notify the Court if Defendant failed to comply with her conditions of release. Ms. Walton stated there are no firearms in her residence.

Defendant's brother Lamar Lockhart-Simmon testified that he is a team leader at an automotive factory. He said Defendant could live with him at his home in Detroit, Michigan. He said he is the sole resident but his minor son stays at his home during the day. Mr. Lockhart-Simmon also agreed to serve as a third-party custodian for Defendant. He will assure that she attends mental health appointments and will report any noncompliance with conditions. Mr. Lockhart-Simmon acknowledged that he was arrested in 2014 for marijuana possession and in 2016 for possession of a firearm. He stated he was not convicted on either occasion and has never been convicted of a firearm or controlled substance offense. Mr. Lockhart-Simmon said he was aware of Defendant's charges in this case and that did not change his willingness to serve as her third-party custodian. He stated there are no firearms in his residence.

In argument, AUSA Jones argued Defendant Simmon presents a danger to the community due to her involvement in the charged conspiracy. He asserted that she was a passenger in the Jeep on November 10, 2021, when police saw a hand-to-hand exchange between the occupants of the Jeep and another vehicle in the mall parking lot. AUSA Jones stated that law enforcement stopped and searched the Jeep, seizing over 200 grams of fentanyl, which was packaged for resale, from the pants of a codefendant. Officers also seized loose cash, cellphones, and two loaded firearms from the Jeep. In a search of a codefendants' apartment later that night, officers seized an additional quantity of fentanyl. AUSA Jones argued that after Defendant Simmon was released on bond for drug and firearms charges relating to the November 10 stop, she posted a photograph of herself holding a gun on Facebook on November 23.

AUSA Jones said Defendant Simmon was involved in drug trafficking after her arrest on November 10, 2021. He argued the December 30, 2021 FBI report shows her efforts to sell drugs to a confidential informant on December 29, 2021. AUSA Jones asserted that Defendant's phone call to the informant, asking if he still needed drugs, demonstrates that she was not a passive observer in the conspiracy. According to AUSA Jones, following Defendant's arrest in March 2022, Judge Patti found her to be a danger to the community and ordered that Defendant be detained. AUSA Jones stated that Defendant's letters to the Court discuss her possession of guns.

The Government argued that Defendant has a history of marijuana use and reported consuming "edibles" two to three times monthly. AUSA Jones said Defendant failed a drug test upon her arrest on March 22, 2022, when she was on a state bond. He acknowledged that Defendant's criminal history is minimal but pointed out her numerous arrests. The Government also noted Defendant's brother's arrest history and expressed concern about Defendant living with

12

her brother. AUSA Jones did not think Defendant is a flight risk because she does not have the means to abscond. He argued that Defendant is properly detained as a danger to the community.

Defense counsel argued that Judge Patti was not aware of some circumstances and that the AUSA in Michigan, relying on information from another district, provided incorrect information in his proffer. Regarding the nature and circumstances of the offense, Ms. Mathis argued that Defendant Simmon was a backseat passenger in the Jeep and was not seen making a hand-to-hand drug exchange on November 10, 2021. Instead, the drugs were found in the pants and backpack of Codefendant Keyasia Davis, and the cash was in the front console of the Jeep. The two guns belonged to Davis and Codefendant Desmond McDaniel. All four passengers were charged for the drugs and guns seized from the Jeep. With regard to the December 29, 2021 statement from the confidential informant, Ms. Mathis emphasized that the substance provided by the informant to police was not a controlled substance but only a cutting agent. She stated that Defendant Simmon was a low-level participant in the alleged conspiracy.

Ms. Mathis argued the weight of Defendant Simmon's dangerousness was low. She maintained that the Government was attributing guilt by association to Defendant. Ms. Mathis characterized posting photographs with firearms on social media as a generational trend, not indicating any real dangerousness. She disagreed with the Government's characterization of Defendant's letters and stated that Defendant consistently maintains that nothing from the November 10 stop belonged to her. According to Ms. Mathis, Defendant's letters support this and also state a codefendant was threatening her.

Defense counsel stated that the United States Probation Office in Michigan recommended that Defendant be released. She argued that Defendant does not present a flight risk because she

13

has no passport or driver's license. She noted that Defendant's family is working to get her driver's license restored. Ms. Mathis stated that Defendant's mother brought her to Tennessee for court proceedings on her state charges and could transport Defendant to this district for hearings in this case. Regarding charges of failure to appear, defense counsel noted that most relate to collections issues and a few have been resolved since Defendant's Michigan detention hearing. Also, she asserted that Defendant's failure-to-appear charges do not relate to serious cases.

Ms. Mathis argued that Defendant has rebutted the presumption of dangerousness because she is a low-level participant in the alleged conspiracy. Her codefendant Donald McCrainey was Simmon's fiancé, and the FBI report shows she was acting at McCrainey's direction while he was driving. Ms. Mathis maintained that conditions exist that can alleviate any danger.

With regard to Defendant's history and characteristics, Ms. Mathis argued that Defendant has concerns about her mental health, that medication for anxiety given at the jail seems to be helping her, and that Defendant is in need of a mental health assessment. Although Defendant has a history of marijuana use, Defendant acknowledges that she cannot use marijuana while on conditions of release. Ms. Mathis pointed out that Defendant has limited criminal history and no history involving drugs or guns. She argued that Defendant has a job working for her mother, who can supervise Defendant at all times. Ms. Mathis stated that Defendant's brother has no drug or firearm convictions and that alternatively Defendant can live with her mother. Thus, Defendant has two third-party custodians and two potential residences. Ms. Mathis said Defendant is willing to wear a GPS monitor, which is available in Michigan. Finally, defense counsel reported that Defendant is no longer in a relationship with Donald McCrainey.

14

AUSA Jones disputed that Simmon was acting at the direction of Donald McCrainey on December 29, 2021. He stated the FBI report shows that Simmon had several conversations with the informant and that she made a hand-to-hand exchange with the informant, providing what the informant believed were controlled substances in exchange for money. AUSA Jones argued that in late December 2021, Defendant was driving around the community engaged in drug trafficking, after being arrested for drug trafficking and gun possession on November 10, 2021. He asserted that Defendant's actions show her to be a serious danger to the community. With regard to the photographs, AUSA Jones believed they were pulled from social media during the investigation in 2021 and are from that year. He acknowledged that Defendant was not prohibited from possession of firearms on November 7, and he stated he did not know if she could have guns after her arrest on November 10.

United States Probation Officer Corey Miller was present at the hearing. At the conclusion of the hearing, he stated that the Probation Office maintained its recommendation that Defendant Simmon be detained.

## IV.    ANALYSIS

The Bail Reform Act of 1984 provides for the release of all persons accused of a federal crime, either on personal recognizance or an unsecured appearance bond, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). If release on personal recognizance or an unsecured appearance bond will not reasonably assure the person's appearance or the safety of the community, the judicial officer shall order that the individual be released on conditions. 18 U.S.C. § 3142(c). Upon the government's motion,

however, the judicial officer may detain a person charged with certain serious federal crimes or who poses a "serious risk" of flight, witness intimidation, or obstruction of justice, if the judge finds, after a detention hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(f) & -(e). The judge may not detain a defendant unless the government proves by a preponderance of the evidence that the individual is a flight risk and/or by clear and convincing evidence that the person is a danger to the community or others. *See* 18 U.S.C. § 3142(f).

Here, the Government moved for detention, and Magistrate Judge Patti held a detention hearing, because Defendant Simmon is charged with an offense under the Controlled Substances Act for which the maximum term of imprisonment is ten years or more. *See* 18 U.S.C. § 3142(f)(1)(C). Due to the crime charged, a rebuttable presumption applies "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3)(A). In this respect, the Indictment provides probable cause to believe that the Defendant has committed an offense under the Controlled Substances Act for which she faces a maximum sentence of ten years or more. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985) (holding that the indictment establishes probable cause for purposes of the rebuttable presumption). This presumption places the burden of production with a defendant, while the government retains the burden of persuasion. *Stone*, 608 F.3d at 945. To satisfy his burden of production, a defendant must present at least some evidence that she is not a danger or a flight risk. *Id.* Even when a defendant meets the burden of production, the Court must continue to weigh the

16

presumption that detention is appropriate along with the other factors, because "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Id.*

"If a person is ordered detained by a magistrate judge . . . , the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The district judge reviews the decision to release or detain the defendant *de novo*.[8] *United States v. Yamini*, 91 F. Supp. 2d 1125, 1128 (S.D. Ohio 2000) (holding that although the Sixth Circuit has yet to address this issue, the majority of circuits hold that *de novo* review is appropriate); *see also see also United States v. Rosello*, No. 1:21-cr-7, 2021 WL 5759142, at *1 (S.D. Ohio Dec. 4, 2021) (quoting *Yamini*); *United States v. Tolbert*, Nos. 3:09-CR-56-TAV-HBG & 3:10-CR-30-TAV-HBG, 2017 WL 6003075, at *4 (E.D. Tenn. Dec. 4, 2017). "[M]eaningful de novo review means that the district court should engage in the same analysis, with the same options, under § 3142 as the magistrate judge." *Yamini*, 91 F. Supp. 2d at 1129; *Tolbert*, 2017 WL 6003075, at *4 (observing that the district judge has discretion to consider additional evidence to that presented at the original detention hearing). A motion to revoke or amend a detention order "shall be determined promptly." 18 U.S.C. § 3145(b).

---

[8] Although a magistrate judge cannot review another magistrate judge's decision to release a defendant, a district judge may refer the government's motion to revoke a release order to a magistrate judge for report and recommendation. *United States v. Shaw*, No. 5:17-CR-26-KKC-REW, 2017 WL 5711438, at *2–3 (E.D. Ky. Nov. 17, 2017), *adopted by*, No. 5:17-CR-26-KKC-REW, 2017 WL 5710443 (E.D. Ky. Nov. 27, 2017). The district judge will ultimately conduct a *de novo* review of the detention issue by reviewing the report and recommendation, which considers all the evidence offered to that point. *Id.* at *3.

17

To determine whether Defendant Simmon should be released or detained pending trial, the Court must weigh the factors set out in 18 U.S.C. § 3142(g), along with the presumption from 18 U.S.C. § 3142(e)(3)(A), and conditions of release, to determine if release on conditions will reasonably assure Defendant's appearance at Court proceedings and the safety of any person and the community. The Government concedes and the Court agrees that Defendant Simmon does not present a flight risk. The Court therefore examines only whether clear and convincing evidence shows Defendant to be a danger to the community and, if so, whether conditions can mitigate that danger.

Before turning to the § 3142(g) factors, the Court finds, as stated above, a presumption in favor of detention applies in this case. Section 3142(e)(3)(A) provides that, if a defendant is charged with an offense under the Controlled Substances Act, for which a maximum term of imprisonment of ten years or more is prescribed, a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. Defendant Simmon is charged with conspiring to distribute fentanyl and with aiding and abetting the possession of fentanyl with intent to distribute [Doc. 3], which is a qualifying offense under § 3142(e)(3)(A). She is also charged with aiding and abetting the possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) [Doc. 3], which also qualifies her for the application of the presumption under § 3142(e)(3)(B).

The next question, then, is whether Defendant Simmon has rebutted the presumption. Defendant's burden to rebut the presumption "is not heavy" but she must come forward with some evidence. *Stone*, 608 F.3d at 945–46. Defendant has done so here. Defendant Simmon presented the testimony of her mother Tomeeka Walton and her brother Lamar Lockhart-Simmon, both of

18

whom agree to be her third-party custodians. Defendant's brother and, per counsel's proffer, her mother, both agree to allow Defendant to live with them and to contact the USPO if Defendant is not compliant with her conditions of release. Defendant's mother agrees to employ Defendant in her elder-assistance business and to supervise her while she is working. Thus, Defendant would be under the supervision of a third-party custodian both at home and at work. The Court finds Defendant has thus rebutted the presumption in § 3142(e)(3) that she is a danger to the community. *See, e.g.*, *United States v. Johnson*, No. 5:20-cr-33-GFVT-MAS, 2020 WL 2413823, at * 4 (E.D. Ky. May 15, 2020) (finding that the defendant rebutted the presumption of dangerousness where he offered a third-party custodian).

The Court, however, still considers the presumption in its determination of whether conditions exist that could assure community safety. *United States v. Hinton*, 113 F. App'x 76, 78 (6th Cir. 2004) ("The presumption in favor of detention does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class.'" (quoting *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986))).

Turning to the § 3142(g) factors, the Court first considers the nature and circumstances of the charged offense. 18 U.S.C. § 3142(g)(1). Defendant Simmon is charged, along with ten named codefendants and unnamed others, with conspiring to distribute four hundred grams or more of fentanyl over a twenty-month period [Doc. 3]. Defendant Simmon is also charged with aiding and abetting the possession of more than four hundred grams of fentanyl for resale and aiding and abetting the possession of firearms in furtherance of drug trafficking on November 10, 2021 [Doc. 3]. The Indictment charges Defendant with a large amount of fentanyl, which is a particularly

19

dangerous controlled substance. *See United States v. Taylor*, 449 F. Supp. 3d 668, 673 (E.D. Ky. 2020) (finding fentanyl to be an "exceptionally dangerous drug" under § 3142(g)(1)); *see also United States v. McCollum*, No. 3:21-CR-35-TAV-DCP-2, 2021 WL 4468937, at *2 (E.D. Tenn. Sept. 29, 2021) (upholding magistrate judge's finding that fentanyl is a particularly dangerous drug under § 3142(g)(1)). The Court finds that the nature and circumstances of the offense show that Defendant Simmon presents a serious danger to the community. This factor weighs in favor of detention. 18 U.S.C. § 3142(g)(1).

The weight of the evidence of the Defendant Simmon's dangerousness also favors detention. 18 U.S.C. § 3142(g)(2). In *United States v. Stone*, the Sixth Circuit clarified that the weight of the evidence against the defendant "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." 608 F.3d at 948. Exhibit 1 shows that Defendant Simmon was a passenger in a vehicle stopped following a suspected hand-to-hand drug transaction in a mall parking lot on November 10, 2021. The subsequent stop and search of the vehicle yielded over 200 grams of fentanyl, over $4,000 in currency, and two firearms. Defendant argues that she was a mere passenger in the vehicle and that the drugs, money, and firearms were associated with the other occupants. But Defendant's characterization of herself as a mere passive observer to others' drug trafficking is belied by the FBI report of the December 29, 2021 controlled buy.

That FBI report describes the informant's hours-long attempt to buy fifteen grams of heroin from the drug trafficking organization, beginning with a call to Codefendant Lauren Manns. Over the course of the afternoon, Defendant Simmon called the informant, confirmed he still wanted to purchase drugs and the amount, and directed him to meet her and McCrainey at several locations.

Simmon directed the informant not to park near her apartment to avoid arousing the neighbors' suspicions. She also declined the informant's offer to meet her and McCrainey, stating she would not have the drugs until she went to her residence. The report states that Simmon left her apartment building, got into the informant's vehicle, directed him to drive to the complex's entrance where McCrainey was waiting for her, and gave him suspected heroin in exchange for $1050. While Simmon was in the car with him, the informant overheard a telephone call in which Simmon appeared to be taking another drug order and said, "Okay, I'm about to send it." The Court finds that Exhibit 1 shows that Defendant Simmons was involved in drug trafficking on behalf of the conspiracy in late December 2021, after her arrest on November 10, 2021.[9]

As demonstrated by Exhibit 1, Defendant engaged in drug trafficking on behalf of the drug trafficking organization. Given this activity, the weight of the evidence of Defendant Simmon's dangerousness is great. Indeed, drug trafficking is inherently dangerous, *United States v. Hernandez*, No. 1:02–CR–006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002), and "[i]t is beyond dispute that distributing narcotics is a serious offense that poses dire health risks to the community—and the risks associated with fentanyl specifically are even greater," *Taylor*, 449 F. Supp. 3d at 673.

Next, the Court must consider a host of factors relating to the history and characteristics of the Defendant. 18 U.S.C. § 3142(g)(3)(A). The Court finds that parts of Defendant's history and characteristics support detention. The Pretrial Services Report, prepared on August 10, 2022,

---

[9]    The Court's finding is not altered by the fact that the product sold to the informant did not contain a controlled substance. The FBI report from the December 29, 2021 controlled buy shows Defendant Simmon's involvement and role in the drug trafficking organization and reveals that the informant believed he was purchasing a controlled substance.

21

reveals that Defendant did not have a stable home prior to her arrest on March 22, 2022. Also, Defendant was unemployed at the time of her arrest and reported working only seven months since September 2019. The PSR reflects that Defendant reported using marijuana "edibles" two or three times monthly.[10]

The PSR also reveals that Defendant Simmon has convictions for identity theft,[11] uttering counterfeit notes, and driving on a suspended license. Defendant violated her probation for the counterfeit notes conviction. Aside from these convictions, Defendant was arrested four times from age twenty-two to twenty-four, including her November 2021 arrest for drug offenses in Tennessee. *See Tolbert*, 2017 WL 6003075, at *4 (holding that "the court may consider both actual convictions and mere arrests or indictments to assess the defendant's dangerousness, though the latter will typically weigh less heavily in favor of detention); *see also United States v. Acevedo-Ramos*, 755 F.2d 203, 209 (1st Cir. 1985) (finding that the authors of the Bail Reform Act of 1984 intended for judges to "rely on a defendant's past bad conduct that had led to indictment but not conviction" under some circumstances). Defendant's arrest history also includes an October 2019 arrest for malicious destruction of personal property. Defendant was released on conditions following this arrest. Defendant has numerous failure-to-appear warrants, including failing to appear for proceedings on the malicious destruction of property offense.

Other parts of Defendant's history and characteristics lend support for release. Defendant is a twenty-seven-year-old, lifelong resident of Detroit, Michigan. She is in good physical health,

---

[10]     The Court recognizes that marijuana use is not illegal in Michigan.

[11]     The Court notes that Defendant argues this conviction was later subject to a pretrial diversion program and dismissed.

22

could work for her mother, and intends to seek mental health treatment. Defendant has family support from her mother and brother and has a close relationship with her sister. Defendant is no longer in a relationship with Codefendant Donald McCrainey and understands she cannot have contact with him if released. While these characteristics favor release, the Court finds as a whole factor (g)(3) supports detention, due to Defendant's criminal history and history of failing to appear for court proceedings.

As for "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," 18 U.S.C. § 3142(g)(4), like Judge Patti, the undersigned finds that the danger Defendant presents to the community is from continued drug trafficking. Defendant is alleged to have participated in a conspiracy trafficking over 400 grams of fentanyl and was present in a vehicle during a suspected drug transaction in a mall parking lot. The stop of that vehicle resulted in the seizure of drugs and guns and in Defendant being charged in state court with drug offenses. Following that arrest, Defendant engaged in a controlled buy on December 29, 2021. This shows Defendant presents a particular danger to the community—that is, continued drug trafficking— if she were released. *See Hernandez*, 2002 WL 1377911, at *2 (holding that "the risk of continued drug-trafficking while released on bail constitutes a significant danger to the safety of the community"). The Court finds factor (g)(4) also weighs in favor of detention.

The Court observes that the USPO recommends that Defendant not be released because of her dangerousness, and considering all the § 3142(g) factors and the presumption, the Court finds that the information provided in the PSR and Exhibit 1 establishes by clear and convincing evidence that the Defendant poses a danger to the community. The Court also finds that no condition or combination of conditions will reasonably assure the safety of the community. The

23

Court has considered the proposed conditions, including that Defendant will live with her brother and work for and with her mother, both of whom will serve as third-party custodians, and that she will participate in mental health treatment and submit to GPS monitoring. Defendant, however, has repeatedly violated court orders and conditions of release. Defendant violated her probation in March 2019 and failed to appear while released on conditions in October 2019. Defendant possessed a firearm (as depicted in her November 23 Facebook photo) and engaged in drug trafficking (as evidence by the FBI report on the December 29, 2021 controlled buy) following her release on state drug charges in November 2021. Given this conduct, the Court has no confidence that Defendant would follow any conditions the Court would impose.

## V.    CONCLUSION

Based upon a *de novo* review of all the evidence presented at the detention hearing in the Eastern District of Michigan and to the undersigned, and considering the factors set forth in 18 U.S.C. § 3142(g), as well as the presumption and the recommendation of the United States Probation Office, the Court finds by clear and convincing evidence that Defendant Simmon is a danger to the community and that there are no conditions that would mitigate that danger and reasonably assure the safety of the community. Accordingly, the undersigned **RECOMMENDS** that Defendant's motion for release on conditions [Doc. 149] be denied and that she remain detained pending further proceedings in this case. Due to the need to determine this issue promptly, 18 U.S.C. § 3145(b), the Court imposes an abbreviated objection period. Any objections to this report and recommendation must be served and filed on or before **September 6, 2022**.[12]

---

[12]    Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in

24

Any response to objections must be filed on or before **September 13, 2022**. If either party deems

no objection or response is necessary, it shall file a notice of same as soon as possible and no later

than the deadline for objection or response.

                Respectfully submitted,

                Jill E. McCook
                United States Magistrate Judge

---

compliance with the required time waives the right to appeal the district court's order). The District Judge need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).